# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

PATRICIA PETTIT,

               Plaintiff,                     Civil Case Number: 08-12205

v.                                      PAUL D. BORMAN
                                      UNITED STATES DISTRICT COURT

STEPPINGSTONE CENTER FOR THE
POTENTIALLY GIFTED d/b/a
STEPPINGSTONE SCHOOL FOR GIFTED
EDUCATION, a domestic non-profit
organization and KIYO MORSE, jointly and
severally,

               Defendants.

_____ /

## OPINION AND ORDER
## GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
## DISMISSING THE ACTION

      Now before the Court is defendants Steppingstone Center for the Potentially Gifted d/b/a

Steppingstone School for Gifted Education and Kiyo Morse's ("Defendants") Motion for Summary

Judgment.  (Dkt. No. 22).  Patricia E. Pettit ("Plaintiff") responded to the Motion on April 1, 2009.

  A motion hearing on the matter was held on July 21, 2009.   For the following reasons, the Court

GRANTS Defendants' Motion and DISMISSES the action.

## I.      BACKGROUND

      This action arises from Plaintiff's claims that she was retaliated against, including being

terminated from Steppingstone School for Gifted Children ("Steppingstone"), as a result of her

raising concerns to the head of the Steppingstone, Defendant Kiyo Morse ("Morse") and then to the

board of trustees that Steppingstone was in violation of the Fair Labor Standards Act ("FLSA").

**A.      Plaintiff's Employment at Steppingstone**

Plaintiff, a former employee of Steppingstone, is a resident of Farmington Hills, Michigan. (Compl. ¶¶ 1, 7, 9).  Steppingstone is a non-profit corporation that operates a small private elementary school geared towards gifted children in Farmington Hills, Michigan.  Morse founded Steppingstone in the early 1980s and currently serves as the head of the school, a position that she's held since its founding.

Plaintiff began her employment for Steppingstone in January 2006.  (Pl. Dep. 35:7-11).  Prior to her beginning employment for Steppingstone, Plaintiff was familiar with the school because two of her three children went there for school; the third started sometime thereafter.  (Pl. Dep. 26:1-3).  In fact, her employment arose out of a conversation with Morse, where Morse informed Plaintiff about a potential opportunity for employment as an admissions director after hearing from Plaintiff that she was having difficulty paying tuition for her three children at the school.  (Pl. Dep. 33:10-34:15).  Through the help of an outside contractor, Plaintiff and Steppingstone were able to work out an arrangement where Plaintiff's thirty-five dollar per hour salary was credited toward her children's tuition without any tax liability for either Plaintiff or Steppingstone.  (Pl. Dep. 38:1-13).

In the spring of 2006, Plaintiff's job duties expanded to include human resources responsibilities.  (Pl. Dep. 42:19-22).  This involved training the faculty on conducting interviews with prospective teachers, creating interview questions, and developing a process for hiring new staff.  (Pl. Dep. 42:23-43:4).   At Plaintiff's request, Steppingstone gave her the title of Director of Human Resources.  (Morse Dep. 73-74).

On September 8, 2006, Plaintiff signed her first contract with the school.  (Pl.'s Resp. Ex.

A).  The term of the contract was from January 1, 2006 through December 31, 2006.  (*Id.*).  While the contract states that her responsibilities include admissions and student recruitment, as well as the development and coordination of human resources processes and responsibilities, it states that "[t]he administration may from time to time add or delete responsibilities initially discussed as determined by the administration for the needs of the school."  (*Id.*).

### B.    FLSA Compliance

Sometime before December 2007, Plaintiff became concerned regarding Steppingstone's compliance with the FLSA.  (Pl.'s Dep. 50:5-10).  Specifically, Plaintiff was concerned that Donna Coffin and Sandy Blay, two of Plaintiff's former co-workers, were improperly characterized as FLSA exempt rather than non-exempt.  In addition, Plaintiff felt that her own position should be classified as exempt rather non-exempt.

In early December 2007, Plaintiff approached Morse with her concerns regarding the school's compliance with FLSA.  According to Morse, Plaintiff did not elaborate on the problem at that time; she told Morse that she could not explain it to her, so she would send an e-mail or document explaining the issue. (Morse Dep. 100:7-12).  Plaintiff testified that she did not elaborate on the issue because she wanted to gather more information and have a better understanding of the classification differences before further discussing the issue with Morse.  (Pl.'s Dep. 70:1-11).

Without first receiving approval for the expenditure, Plaintiff contacted Steppingstone's outside law firm, Nemeth Burwell, on December 13, 2007 to discuss Coffin's and Blay's classification as exempt employees and her classification as a non-exempt employee.  (Pl.'s Dep. 70:11-71:17).

After contacting Nemeth Burwell, Plaintiff testified that she "got real serious," because the

conversation confirmed her uneasiness that bookkeepers and administrative assistants, positions Plaintiff believed Sandy Blay and Donna Coffin had held at Steppingstone at that time, traditionally are classified as non-exempt.  (Pl.'s Dep. 80:19-25).   Her goal was to educate Morse as to the classifications and the entire FLSA process because she believed that Blay and Joel Gardner, a certified public accountant who contracts with Steppingstone, must not have educated Morse on the FLSA issues.  (Pl.'s Dep. 81:19-82:6).   Plaintiff found a website, which she thought provided a good layman's explanation of FLSA classifications, so she copied the language, formatted it, and delivered a copy of the re-formatted document to Morse the last day before winter break 2007. (Pl.'s Dep. 82:14-25).

On January 14, 2008, Plaintiff sent an e-mail to Morse:

> I feel that I need to reiterate what I indicated over a month ago about FLSA non-compliance and the possibility that if this issue continues to go unaddressed the organization is exposed.  And based on what you've said so far the organization does have liability that is not accounted for.  This is an [human resources] area and Sandy [Blay] has indicated that she has no background in this.
>
> The issue continues to be unaddressed and, as you can probably tell from this e-mail and those previous, plus my trying to speak to you on it, my concern for [Steppingstone's] possible risk is very real.  After I gave you written information in December, we scheduled a meeting to discuss it but when that got cancelled and you said we'd meet as soon as possible, I guess I really thought it might come up on the radar so this could all be worked on. . . .

To which, Morse responded the following day: "I've checked with attorney consultants, pro bono, and they have assured me that your other issues are not a concern for us.  I'm not spending anymore time on this issue at this time.  We can revisit later when I'm through the relocation issues."  (Defs.' Br. Ex. 8, Jan. 15, 2008 Email).

Plaintiff sent another e-mail to Morse on January 15, 2008, where she again raises the FLSA issue and the potential misunderstanding between the parties:

4

While there are things going on on the accounting side I may not understand and some I do, and the part that I'm pretty confident that I understand more about in terms of its stickiness :) is the HR side.  I'm glad that you didn't have to pay for whatever information you got from the pro bono contact you mentioned in your other email because you might be asking for a refund otherwise! :) Three possible things 1) they weren't up on the regs or 2) the questions that needed to be asked weren't (and please don't take that the wrong way – how could you know what to ask since we haven't talked specifically about what the problem is) or 3) I'm missing a piece of information from you about classification or pay practices.  I've gone over the latter to see if there's something that I may have missed with regard to the information I have, and can't seem to find anything.

The organization being hurt financially and/or legally continues to be my concern, and it grows as more time passes without us a[t] least spending maybe 15 minutes talking to gain understanding, bridge the gap and move forward.

(Pl.'s Resp. Ex. F, Jan. 15, 2009 Email).

The relocation issues that Morse was referring to in her response e-mail had to deal with the future physical location of Steppingstone.   In December 2007, the owners of the property upon which Steppingstone was located informed the school that it could no longer use the property and that it would need to be vacated by the end of the 2007-2008 school year.  (Morse Dep. 231:7-17, Furman Dep. 49:15-17).   Because of this uncertainty as to the location of the school and its importance to the survival of Steppingstone, Morse informed Plaintiff in January 2007 that Plaintiff had to concentrate all of her efforts on student admission and recruitment and forego her human resources work.  (Morse Dep. 208:3-14; *see* Niemesto Dep. 26:16-27:6).

On February 1, 2008, Plaintiff sent an e-mail to the Executive Committee of the Steppingstone Board of Directors ("Executive Committee"), which provided in part:

As your Human Resources Director as well as your Admissions Director, it is my professional opinion that Steppingstone has been and continues to be in violation of [FLSA].  I have notified/re-notified school administration regarding the problem numerous times in writing and verbally over the last 8 weeks.  Responses indicate to me little interest in coming into compliance at this time.  Further, numerous indications are that there is little understanding of the issues so I am unclear that

5

there will ever be interest in coming into compliance.

Should Steppingstone decide to create a Wage and Hour program that is in compliance with the law by February 15, 2008, I will enthusiastically support the decision and work to meet that goal in addition to dedicating myself to admissions goals. Should Steppingstone decide not to seek the support of professional resources to rectify the problem, as I do not want to be in the position of knowingly working in an organization that is out of legal compliance, I see no choice but to report unlawful activity to the U.S. Department of Labor.

(Defs.' Br. Ex. 9) (emphasis added).

Morse responded to Plaintiff's e-mail shortly thereafter, stating that she had thought they had settled this issue over a month ago when they reviewed the FLSA summary. (Defs.' Br. Ex. 7). In addition, Morse explained that she spoke with a legal consultant and Nancy Furman, a Steppingstone executive committee member who has a master's degree in human resources and worked in the field with Chrysler until her recent retirement, and that both of them assured that Steppingstone was in compliance. (Defs.' Br. Ex. 7).

From February 3, 2008 to February 7, 2008, Plaintiff and Morse exchanged a series of lengthy e-mails, in which the Executive Committee was "cc'd," primarily discussing the FLSA compliance issue.  (Defs.' Br. Ex. 8).  The first e-mail sent by Plaintiff on February 3, 2008 details, at great length, Plaintiff's attempts to discuss the issue with Morse.  In addition, Plaintiff detailed her frustration that she was excluded from Morse's discussions with other counsel, even though Plaintiff explicitly warned Morse that because Morse may not completely understand the problem, she may not be getting good advice.  (*Id.*, Feb. 3, 2008 E-mail).  Plaintiff also stressed that her frustration was exacerbated by the fact that Morse knew that Plaintiff obtained legal advice from employment attorneys in December yet Morse never bothered to ask Plaintiff what the employment attorneys had to say. (*Id.*)

6

Morse sent a reply e-mail to Plaintiff the next day, stating that since the events Plaintiff described in her February 1, 2008 e-mail transpired, they have had regular meetings on Tuesdays at 3:00 p.m., during which Plaintiff has not raised these issues to Morse even though Morse asked Plaintiff if she had issues she wanted to discuss, but that they can try again at their regularly scheduled meeting the following day.  (*Id.*, Feb. 4, 2008 E-mail).   In addition, Morse asked which employees Plaintiff was concerned with and what actions she suggest Steppingstone take to remedy the situation.  (*Id.*)

On Tuesday, February 5, 2008 at 2:36 p.m.—only thirty minutes before their regularly scheduled meeting—Plaintiff sent another lengthy e-mail to Morse.  (*Id.*, Feb. 5, 2008 E-mail).  Again, Plaintiff details her concerns, what should have been done to remedy the situation, and what should be done going forward.  (*Id.*)

Morse responded to Plaintiff's e-mail the following evening.  (*Id.*, Feb. 6, 2008 E-mail).  She begins her e-mail by stating that the issues that Plaintiff has chosen to communicate to the Board are not Board issues they are administrative issues.  (*Id.*)  Morse went on to inform Plaintiff that she did not agree with Plaintiff's classification of Donna Coffin's and Sandy Blay's positions as non-exempt and Plaintiff's own position as exempt.  (*Id.*)  Morse spent a majority of the remainder of her e-mail refuting and rebutting Plaintiff's various charges from previous e-mails.  (*Id.*)

Plaintiff responded with another lengthy e-mail in kind the following day.  (*Id.*, Feb. 7, 2008 E-mail).

### C.    Retaliation

Sometime in early March, 2008, Plaintiff presented a document to Morse, in which Plaintiff detailed examples of perceived retaliation against her.  (Morse Dep. 228:1-4).  Morse informed

Plaintiff that she was not going to respond to the document at this time but that she would get back to Plaintiff at a later time.[1]  (Morse Dep. 228:13-22).

On March 6, 2008, Plaintiff sent a second letter to the Executive Committee, this time claiming that Morse had retaliated against her for raising the FLSA issue with the Executive Committee.  (Defs.' Br. Ex. 9, March 6, 2008 Letter).  Plaintiff attached a list of seventeen alleged acts of retaliation she experienced after she sent the February 1, 2008 letter to the Executive Committee.  (*Id.*)  These included an elimination of her human resources responsibilities from her position, a reduction of hours, being charged for use of the extended day program, and her most recent employment contract only extending for a period of five months.   Plaintiff then demanded a list of remedies for those retaliatory acts but assured the Executive Committee that any lawsuit would be a last resort. (*Id.*)

In response to the March 6, 2008 letter, Morse wrote an e-mail to the Executive Committee asking them if they could put Plaintiff's letter writing on the upcoming meeting agenda so that they can decide on a single response from all of the members when Plaintiff communicates with them. (Pl.'s Resp. Br. Ex. M, March 7, 2008 E-mail).  The e-mail provides in pertinent part:

> I need her to have no outlet for her letters so that she quits spending school time and money on it.  We need to be paying her for admissions, not creative writing.
>
> . . .
>
> Just so you know, my tolerance stems from my sensitivity to the amount of change and/or conflict that our parent body can tolerate.  I feel that having this employee quit or be fired at this particular time would not be in the best interest of the school.  I feel that she needs a firm redirection from all parties to do her job of

---

[1]  Morse testified that she did not get back to Plaintiff before the March 6, 2008 letter because she was overwhelmed with the relocation issue and because she mostly turned the issue over to Steppingstone's attorney.   (Morse Dep. 228:18-229:15).

admissions, and I think we all need to be saying the same thing in the fewest words possible. My goal is to find a way to get her best efforts in admissions, to the benefit of the school, and to get her efforts off of these other issues.

(Pl.'s Resp. Br. Ex. M, March 7, 2008 E-mail).

### D.    Plaintiff's Employment Contract

Many of the alleged retaliatory acts detailed in Plaintiff's March 6, 2008 letter dealt with Defendants' recent handling of her employment contract. Sometime in January 2008, Morse approached Plaintiff to remind her that she still needed to sign an employment contract with the school. (Morse Dep. 245; Pl.'s Dep. 181-182). Then, on February 5, 2008, Morse presented Plaintiff with a employment contract, which was slightly different from her prior contract in that it expired on June 30, 2008, not the end of the year, and in that it stated "[n]o other expenses may be offset by earned tuition credits." (Defs.' Br. Ex. 10, Feb. 5, 2008 Letter). In the letter, Morse explains that Steppingstone had been operating on an extension of Plaintif's former employment agreement and an oral agreement. (*Id.*) After again stressing the importance of Plaintiff's admissions and recruiting activities during this time, Morse goes on to state the following:

> I have a tendency not to express appreciation as would benefit my employees, assuming that they understand that I am appreciative of their efforts. However, I think it would be appropriate at this time to say that I have sincerely appreciated your willingness and ability to guide and assist with the various issues that have arisen over the last six months.

(*Id.*).

Sometime thereafter, Plaintiff requested that the contract be modified to terminate on December 31, 2008 not June 20, 2008—the end of the school year 2007-2008 school year. While Morse agreed with that change, she did not present a new contract to Plaintiff until March 11, 2008, five days after Plaintiff presented her second e-mail to the Executive Committee. This time, Morse

9

presented Plaintiff the new contract in Morse's office, where she was joined by attorney Eric Stempien.  The new contract did not resemble her previous contracts and contained several new provisions, including a one-year non-compete clause for the recruitment of Steppingstone students in several metropolitan Detroit counties, a termination provision allowing the contract to be terminated by either party, for any reason, by providing thirty day written notice to the other party, and limiting hours to twenty per week unless otherwise approved by Morse.  (Pl.'s Br. Ex. N). Plaintiff again rejected this offer and obtained legal counsel to negotiate the terms of her contract with Steppingstone's legal counsel, Eric Stempien.

Over the next couple of months, the parties negotiated various contract proposals.  During this time period, Steppingstone presented Plaintiff with at least six more proposed contracts.  (*See* Defs.' Br. Ex. 12).  On May 5, 2008, Morse presented Plaintiff with a final contract offer ("May 5, 2008 Contract").  (Pl.'s Resp. Br. Ex. R).   Through three letters dated May 6, 7, and 8, 2008, Steppingstone, through counsel, informed Plaintiff that without a contract, there was no agreement between her and the school for future employment, and that she would have to turn in her keys. (Defs.' Br. Ex. 13, May 6, 7, and 8 Letters).

On May 9, 2008, Plaintiff attempted to go to work.  (Pl.'s Dep. 200).  At Morse's request, Sandy Blay and Donna Coffin greeted Plaintiff at the door and told her that she either had to sign her contract or turn in her keys to them.  (Coffin Dep. 90:22-91:23).  Plaintiff refused to do either and went to her office, where she was followed by Blay.  (Coffin Dep. 94:9-11). After Plaintiff refused to leave, Coffin contacted Board President Niemesto, who at that time was the assistant police chief of Farmington Hills.  (Coffin Dep. 95:2-9).  Niemesto informed Coffin that he was not available at that time but that he could send over a couple of police officers to ensure that peace was

to be preserved.  (Coffin Dep. 95:9-11, Niemesto Dep. 54:19-21).  Two police officers arrived

shortly thereafter and escorted Plaintiff from the building.  During this entire time, Morse stayed in

her office.  (Coffin Dep. 96:16).

On May 20, 2009, Plaintiff filed the instant action alleging retaliation in violation of 29

U.S.C. § 215(a)(3) of the FLSA.

## II.    ANALYSIS

### A.    Legal Standard

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim,

or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a

summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. P. 56(b).

Summary judgment is appropriate where the moving party demonstrates that there is no genuine

issue of material fact as to the existence of an essential element of the nonmoving party's case on

which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the
> district court of the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions on file, together
> with the affidavits, if any," which it believes demonstrate the absence of a genuine
> issue of material fact.

*Id.* at 323; *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact

"would have [the] effect of establishing or refuting one of the essential elements of a cause of action

or defense asserted by the parties."  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)

(quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted).  A dispute over a material

fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993).  In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party.  *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23.  The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e).  The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact.  *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

### B.   Retaliation in Violation of the FLSA

The FLSA protects an employee from retaliation by an employer if the employee files a complaint or institutes or causes the institution of any proceeding under the FLSA.  29 U.S.C. § 215(a)(3) (2009).   Where, as here, there is no direct evidence of retaliation, courts employ a burden-shifting test to evaluate circumstantial evidence of retaliation. *Adair v. Charter County of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006).

Under the burden-shifting analysis, Plaintiff bears the initial burden of producing evidence to support her prima facie case: (1) that she engaged in an activity protected by the FLSA; (2) that the protected activity was known to Steppingstone; (3) that Steppingstone took adverse action against her; and (4) that there was a causal connection between the protected activity and the adverse employment action. *Porter v. Roosa*, 259 F. Supp. 2d 638, 655 (S.D. Ohio 2003) (*citing Williams v. General Motors Corp.*, 187 F.3d 553, 568 (6th Cir. 1999). Once a prima facie showing has been made, the burden shifts Defendants to articulate a legitimate, non-retaliatory reason for their employment decision. *Williams*, 187 F.3d at 658 (*citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If Defendants meets their burden, the ultimate burden shifts back Plaintiff to produce evidence sufficient to support a finding that Steppingstone's proffered reason is merely pretext for retaliation. *Id.* (*citing Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 883 (6th Cir. 1996)).

### 1.    Protected Activity

Plaintiff claims that she engaged in protected activity by notifying Morse of concern that Steppingstone was in violation of the FLSA and by continuing to urge Morse and then Steppingstone's Executive Committee to remedy the non-compliance, even going so far as to threaten to report the perceived unlawful activity to the U.S. Department of Labor.

Defendants argue that Plaintiff did not engage in protected activity because (1) in reporting the potential violations to Defendants she was merely performing her duties as a human resources or personnel manager and (2) even if Plaintiff did step outside of her role as a human resources manager, by the time she did so, the whistle had already been blown and Defendants were taking corrective actions to remedy the situation.

13

A plaintiff does not engage in protected activity when in the course of performing her duties in human resources or personnel she informs her employer "that it is at risk of claims that might be instituted by others as a result of its alleged FLSA violations." *McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486 (10th Cir. 1996).

> In order to engage in protected activity under § 215(a)(3), the employee must step outside his or her role of representing the company and either file (*or threaten to file*) an action adverse to the employer, actively assist other employees in asserting FLSA rights, or otherwise engage in activities that reasonably could be perceived as directed towards the assertion of rights protected by the FLSA.

*Robinson v. Walmart Stores, Inc.*, 341 F. Supp. 759 (W.D. Mich. 2004) (*quoting McKenzie*, 94 F.3d at 1486 (emphasis added).

In the case at bar, Plaintiff testified that she was raising her concerns as a function of her duties as a human resources director and for the purpose of protecting Steppingstone against any potential exposure.[2]  (Pl.'s Dep. 71:18-20).   Additionally, Plaintiff indicated in several of her e-mails, including her e-mail to the Executive Committee, that she was acting as part of her role as Steppingstone's human resources director and that she was concerned for Steppingstone's potential liability.  But, in her February 1, 2008 e-mail to the Executive Committee, Plaintiff warned that "[s]hould Steppingsone decide not to seek the support of professional resources to rectify the problem . . . , I see no choice but to report unlawful activity to the U.S. Department of Labor."

---

[2]  As Defendant points out, after a short break during her deposition, Plaintiff asked to clarify her remarks:

> A     The last question before break you asked essentially I believe why I was doing this and was it to protect Steppingstone.
>            Yes.  Absolutely.  In my professional opinion there was illegal activity going on.   And not only did I want to protect Steppingstone and want the illegal activity to stop, but I wanted not to be personally part of any kind of that activity.

(Pl.'s Dep. 104:3-10).

14

(Defs.' Br. Ex. 6).   The Court considers this statement an exercise of FLSA protected activity, as it constitutes a distinct threat against Steppingstone.

Defendants cite *Claudio-Gotay v. Becton Dickinson Caribe, Ltd.*, 375 F.3d 99 (1st Cir. 2004) in support of their argument that Plaintiff's threat of reporting the alleged unlawful activity to the U.S. Department of Labor was not a protected activity.   There, the plaintiff, a safety/environmental and process engineer employed by the defendant, was responsible for monitoring the security guards at one of the defendant's plants in Puerto Rico.   *Id.* at 101.   The security guards were hired through a contractor, and part of the plaintiff's responsibilities included approving the guards' invoices for payment.   *Id.*   While examining the invoices submitted by the contractor, the plaintiff discovered that the security guards were not being properly compensated for overtime hours worked.   *Id.*   The plaintiff then informed his superiors about the potential labor violations and wrote a letter to the defendant explaining the potential violation.   *Id.*   In response to the letter, the defendant held a meeting with its attorney and the plaintiff in attendance.   *Id.* at 101, 103.   During that meeting, the defendant's management determined that the security guards were not employees of the defendant, and that as a result, the defendant was not responsible for ensuring that the defendants received overtime pay.   *Id.* at 101.   As an additional precaution, however, the defendant's management decided to send a letter to the contractor, informing it that it might be in violation of the FLSA.   *Id.* The plaintiff's supervisors then told him that he should approve the invoices.   *Id.*   The plaintiff refused to do so and was terminated.   *Id.*

The plaintiff then filed suit claiming that both his initial communication to the defendant that it was in violation of the FLSA and his later refusal to sign the invoices constituted statutorily protected activity.   The First Circuit affirmed the district court determination as to both activities.

It initially held that the plaintiff was merely performing his job when he alerted the defendant to the potential violation.  As to his refusal to sign the invoices, the First Circuit found that this activity did not trigger the protection of 29 U.S.C. § 215(a)(3) at least in part because the plaintiff's "refusal to sign the invoices occurred after the whistle had been blown and after corrective actions were being taken to remedy any FLSA violations."  *Id.* at 103.  In so finding, it noted that "[t]he FLSA does not . . . provide a shield against legitimate employer actions.'" *Id.* (*citing Blackie v. Maine*, 75 F.3d 716, 722 (1st Cir. 1996)).

Here, Plaintiff threatened to report the suspected FLSA violations to the U.S. Department of Labor after having briefly discussed the matter with Morse and later being informed by Morse that she had checked with "attorney consultants, pro bono," who had assured her that the FLSA issues were not a concern for Steppingstone.  Therefore, Morse alerted Plaintiff that at least some corrective actions had taken place.  But unlike in *Claudio-Gotay* where the plaintiff was involved in the corrective actions, Steppingstone and, specifically, Morse did not involve Plaintiff in the corrective actions.  In addition, unlike the plaintiff in *Claudio-Gotay*, Plaintiff has significant human resources experience, had already contacted legal counsel regarding her concerns, and was attempting to bring the problem to the attention of a person, who had little human resource experience and who seemed unconcerned with opinion of the legal counsel Plaintiff had contacted. Furthermore, the plaintiff's purported adverse actions in *Claudio-Gotay* were not nearly as direct as those in the instant action.  That is, instead of merely refusing to approve invoices that did not reflect overtime pay, Plaintiff threatened the entire Executive Committee, in writing, that she would report Steppingstone's alleged FLSA violations to the U.S. Department of Labor.

"The FLSA was created to protect an employee who 'lodge[s] complaints or suppl[ies]

16

information to officials regarding allegedly substandard employment practices and conditions.'" *Claudio-Gotay*, 375 F.3d at 103 (*quoting Valerio*, 173 F.3d at 42)).   Unlike in *Claudio-Gotay*, granting protection to Plaintiff's threatened action will advance the purpose for which the FLSA was created.

Accordingly, the Court finds that Plaintiff has established the first element of her prima facie case—that she engaged in statutorily protected activity.

### 2.   Materially Adverse Action against Plaintiff

In order to satisfy the third element of her retaliation claim, Plaintiff must show that she suffered harms that would be considered "materially adverse to a reasonable employee." *Burlington Northern v. White*, 548 U.S. 53, 57 (2006).   A challenged action is "materially adverse" if "it well might have dissuaded a reasonable worker from making or supporting a charge." *Id.* at 68 (internal quotations omitted).   In speaking of material adversity, the U.S. Supreme Court felt it "important to separate significant from trivial harms." *Id.*   The Court went on to stress that the exercise of protected activity does not "immunize [an] employee from those petty slights or minor annoyances that often take place at work that all employees experience." *Id.*   This Court's determination of whether Defendants' actions were materially adverse is inherently fact-specific and "depend[s] upon the particular circumstances" of the case. *Id.* at 69.

As summarized by Defendants, Plaintiff alleges no less than twenty-four retaliatory acts by Defendants in her Answers to Interrogatories:

(1)   Human resources responsibilities were taken from her;
(2)   Her hours were reduced;
(3)   She was not allowed to use earned income to offset the cost of after school enrichment classes for her students;
(4)   Her children were pulled out of a drama class on April 23, 2008 because she had not paid for the class;

17

(5)    She was being charged for using the school's extended day program;

(6)    She did not receive the support that she had previously received, such as someone making reminder calls to parents of potential students for upcoming events;

(7)    She had many new rules, protocol, and reports to complete;

(8)    She was subjected to hostile work environment, including hostile and abusive treatment from Morse and a refusal by Morse to speak or meet with her;

(9)    She was subjected to new onerous timekeeping records;

(10)   Her core hours were kept until 5:00 p.m., but she had to pay for the extended day program;

(11)   She was not given a raise, but other employees were;

(12)   The first contract presented to her was only for five months;

(13)   The next proposed contract presented to her was inconsistent with her first contract and inconsistent with other employee's contracts;

(14)   The second proposed contract was presented to her by Morse and an attorney;

(15)   The contract did not change and pressure was put on her to sign the contract;

(16)   She was blocked from entering the office on her last day of employment;

(17)   She was excluded from activities to retain current students;

(18)   Admissions duties were taken from Plaintiff and given to Donna Coffin;

(19)   Many new "roadblocks" were established after affecting her ability to do her job, including no meetings with Morse regarding admissions for three months, an increase in e-mail communication, questions not being answered, new protocol and reports, other staff members being told or allowed to do parts of Plaintiff's job without her knowledge, and being given contradictory objectives;

(20)   Exclusion from meetings that related to her areas of expertise or her job functions;

(21)   Not given clear, consistent information in a timely manner;

(22)   Communication to staff, parents, teachers, and board members that Plaintiff was not a highly valued member of the Steppingstone team;

(23)   Morse met with parents while trying to exclude Plaintiff;

(24)   Discharge from her employment.

(*See* Defs.' Br. Ex. 16).

Defendants contend that most of Plaintiff's alleged retaliatory acts, even if true, fall into the category of minor annoyances and petty slights. Defendants assert that Plaintiff has alleged only seven "true" acts of retaliation. Interestingly, at this point in their Brief, Defendants do not argue that these "true" allegations of retaliation were not materially adverse to Plaintiff; they do that when providing legitimate and non-retaliatory reasons for the alleged acts of retaliation. Instead,

18

Defendants focus on Plaintiff's discharge from Steppingstone and contend that she cannot demonstrate that her separation was materially adverse.   Because many of Plaintiffs "true" allegations of retaliation are memorialized in Defendants' contract offer, the Court considers these allegations when reviewing the circumstances surrounding her discharge from Steppingstone.

### a.        Plaintiff's Revised Contract

Termination is clearly a materially adverse employment action.  *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516 (6th Cir. 2008).   Defendants, however, contend that Plaintiff was not terminated because "[t]he decision not to continue the employment relationship between Plaintiff and Steppingstone was [Plaintiff's] decision and hers alone."  (Defs.' Br. at 17).  Viewing the evidence in the light most favorable to the non-moving party, the Court does not agree.

Morse presented Plaintiff with a renewed employment contract on February 5, 2008.  Prior to this time, Plaintiff had been operating under an oral agreement extending her previous employment agreement, which had expired on December 31, 2006. Even though her previous employment agreement  had been for a period of one-year, this proposed contract, which had an expiration date of June 30, 2008, only had a term of less than five months, yet it was titled "One Year Employment Agreement: 2008."  (Pl.'s Resp. Br. Ex. G). Also unlike the previous contract, it did not mention any human resources responsibilities and contained an additional term preventing the offset of any other expenses besides tuition.  (*Id.*)

When Plaintiff inquired to Morse about the shorter time period, Morse agreed to a change but did not submit a revised contract to Plaintiff until March 11, 2008—five days after Plaintiff provided her retaliation complaint to the Executive Committee.  This new contract contained several new terms, which generally weighed in favor of Steppingstone.  Plaintiff rejected that contract and

six other contracts that contained similar additional terms.

On May 5, 2009, Defendants provided Plaintiff with a final contract offer. Like the March 11, 2008 Contract, the May 5, 2009 Contract contained several different and additional terms than those found in Plaintiff's original contract. The Court addresses the material different or additional terms in turn below.

### 1)     Human Resources Responsibilities

Defendants do not dispute that Defendants first revoked Plaintiffs human resources responsibilities temporarily in January 2008 (before Plaintiff ever engaged in statutorily protected activity) and then documented the later permanent reduction in responsibilities in the May 5, 2009 Contract. Defendants argue that there were legitimate, non-retaliatory reasons for doing so. Therefore, the Court considers Plaintiff's loss of human resources responsibilities a materially adverse action or at the very least an adverse action to be considered along with the other alleged adverse actions.

### 2)     Reduction in Hours

On February 28, 2008, Morse sent an e-mail to Plaintiff stating that she had noticed Plaintiff putting in some long hours and asking that until the FLSA issues had been resolved, Plaintiff limit her hours to no more than eight hours per day and twenty hours per week. (Pl.'s Resp. Br. Ex I, Feb. 28, 2008 E-mail). Morse then instructed Plaintiff to let her know in advance if Plaintiff was unable to complete any requests because of the restriction. The May 5, 2008 Contract documented this change by limiting Plaintiff's hours to twenty per week, unless otherwise authorized by Morse.

Defendants contend that Plaintiff's allegation that her hours were reduced simply is not true. That is, while Morse did request that Plaintiff limit her scheduled hours to twenty per week, she

informed Plaintiff that if she could not complete her tasks in the time allotted, she only needed let Plaintiff know in advance.  Plaintiff, on the other hand, stresses that flexible scheduling had always been acceptable in the past and that suddenly restricting Plaintiff's time is wholly inconsistent with Defendants' contention that more time was needed for admissions and recruitment.

Requiring Plaintiff to seek Morse's approval before working more than twenty hours is not a *materially* adverse action, especially considering that Plaintiff did not point to a single instance where Morse refused any request for additional hours by Plaintiff.   The Court does not consider it as an additional burdensome term as part of the May 5, 2008 Contract.

### 3)   Plaintiff's Use of the Extended Day Service and Enrichment Classes

As indicated above, when Morse presented Plaintiff with a new contract on February 5, 2008, it contained a new term: "No other expenses may be offset by earned tuition credits." (Pl.'s Resp. Br. Ex. G).  Likewise, the May 5, 2008 Contract contained a similar provision: "Employee shall not be entitled to offset any other school related fees against her wages." (Pl.'s Rep. Br. Ex. R).  These provisions effectively precluded Plaintiff from using the tuition credit program for Steppingstone's extended day program and enrichment classes.   According to Plaintiff, from early on in her employment, Morse had allowed Plaintiff to use the extended day program, for free, to accommodate Plaintiff's after school hours and also to use her tuition credits to pay for the cost of her children's attendance in various enrichment classes, which were typically held after school and involved subjects like chess or drama.   (Pl.'s Dep. 140-41, 146-47).

First, with regard to Plaintiff's use of the extended day program, Defendants provide invoices

21

showing that even after Sandy Blay informed Plaintiff in writing on February 28, 2008[3] that she would be charged for use of the extended day program, Defendants continued to honor their original verbal agreement regarding the use of the extended day program. (*See* Defs.' Reply Br., Ex. 5). The invoices show that Plaintiff used the program for free three times in March, eleven times in April 2008, and twice in May 2008, with the last time being only two days before she was terminated. (*Id.*). While the invoices demonstrate that Defendants waived the fees during the contract negotiation process, Defendants have not presented any evidence tending to show that they would have continued to waive the fees after Plaintiff signed her employment contract. This is especially true given Defendants' final contract offer, which clearly provides that Plaintiff would pay all expenses related to her sons' attendance in the extended day program.[4] Therefore, the Court finds that Defendants eliminating Plaintiff's ability to offset her use of the extended day programs constitutes a materially adverse action.

Second, Defendants provide invoices and returned checks showing that prior to Plaintiff reporting her FLSA concerns to Morse and then to the Executive Committee, she had been paying, out of pocket, for the costs of her children's enrichment programs. (*See* Defs.' Reply Br. Ex. 3). According to Sandy Blay, she accidentally applied Plaintiff's tuition credits to her outstanding

---

[3] That letter indicates that Plaintiff was told at the end of January 2008 that she would be charged for the use of the extended day program effective February 1, 2008. This is significant because it occurred before Plaintiff engaged in statutorily protected activity—i.e., threatening to report Steppingstone to the Department of Labor. (*See* Def.'s Br. Ex. 20, Feb. 28, 2008 Letter).

[4] Furthermore, the May 5, 2008 Contract also contained a merger clause, which stated that the May 5, 2008 Contract constituted the entire agreement of the parties, and it superseded all other agreements and understandings among the parties. Thus, to the extent that Plaintiff had an oral agreement with Defendants for the offset of the cost of the extended day program, the May 5, 2008 Contract would have superseded that oral agreement.

balance on her enrichment classes on two occasions.  (Blay Dep. 100:10-23).  When Sandy Blay

noticed the error, she informed Morse, and Morse instructed her to "let it slide this time" because

it was Ms. Blay's fault.  (*Id.*)  Therefore, unlike the extended day program, the Court finds that there

was not materially adverse action against Plaintiff with regard to the enrichment classes.

### 4)    Term Provision

At the motion hearing, Plaintiff's counsel took particular issue with the "Term" provision

of the May 5, 2009 Contract.  That provision provides in relevant part:

> This contract is for one-year only or for the period indicated above and does not
> imply or promise employment beyond the end date.   This contract can not be
> renewed except in writing.  The detailed description of responsibilities related to this
> employment is not included in this contract, and administration may from time to
> time add or delete responsibilities initially discussed when such changes have been
> determined by administration to better meet the needs of the school.  Dissatisfaction
> with these determinations is not a basis for employee to terminate this contract.
> Steppingstone shall determine whether the conduct and/or performance of the
> employee warrants dismissal for cause and this will be determined by joint
> agreement of Administration.

(Pl.'s Resp. Br. Ex. R).

Plaintiff's counsel argued that this provision not only had the effect of changing Plaintiff's

contract into a satisfaction contract but also that it sets up Plaintiff for dismissal as soon as her

contract expires.  The provision does not turn Plaintiff's contract into a satisfaction contract, as the

May 5, 2009 Contract is still only terminable for cause.   Furthermore, to the extent that Plaintiff felt

that she was being pushed out by this new provision or that she was being treated differently from

her colleagues, her argument is simply without merit, as both Sandy Blay's and Donna Coffin's most

recent contracts, signed in August 2007, contained the exact same provision.

### 5)    Termination

After presenting Plaintiff with the May 5, 2009 Contract, Defendants then informed Plaintiff

23

that she either accept their final contract offer or turn in her keys.  Plaintiff refused.  On May 9,

2009, as Plaintiff arrived for work, she was met by two Steppingstone employees and informed

again that either she accept Steppingstone's final contract offer or turn in her keys.  After refusing

to do either, Plaintiff proceeded to enter her office.  Shortly thereafter, she was escorted from

Steppingstone by two police officers.

The Court finds that these circumstances, when viewed in the light most favorable to

Plaintiff, constitute a termination of Plaintiff's employment.[5]  That is, Plaintiff refused to sign the

May 5, 2008 Contract, because it contained terms different from, and in addition to, her previous

employment agreement, and because she was being treated differently from her co-workers.

### b.      Other "True" Allegation of Retaliation

In addition to the "true" allegations of retaliation that were included as part of the May 5,

2009 Contract, Plaintiff also provides (1) that she did not receive a raise when other employees did

and (2) that she was asked to complete detailed timekeeping records.

---

[5]  Such a finding would seem to be consistent with Michigan law.  Although there appear to be no cases explicitly finding that an employee, who refuses to sign a new employment contract that contains additional or new terms, is terminated by her employer, as opposed to voluntarily leaving her employment, there are several Michigan cases assuming as much.  *See*, e.g., *Boise v. Capital Area Cmty. Servs.*, No. 98-1282, 1999 U.S. App. LEXIS 18447 (6th Cir. 1999) (unpublished) (interpreting Michigan law) (assuming, as given, that the plaintiff was terminated after she refused to sign a new employment agreement that contained a provision she believed violated the Americans with Disabilities Act); *Childrey v. Capital Area Cmty. Servs.*, Nos. 204050, 207843, 1999 Mich. App. LEXIS 460 (Mich. Ct. App. March 5, 1999) (unpublished) (assuming the plaintiff was terminated by her employer after she refused to sign an employment agreement); *see also Sokol v. Labor & Indust. Relations Cmty. of Missouri*, 946 S.W.2d 20 (Mo. Ct. App. 1997) (explicitly finding that the plaintiff employee did not voluntarily quit when he refused to sign a second employment contract and that even if the court had determined as such, the contract changes were substantial thereby giving plaintiff good cause for leaving his employment).  This does not, however, mean that termination was wrongful or in bad faith; it merely means that Plaintiff was terminated by Defendants.

24

### 1)   No Pay Raise

When Morse presented Plaintiff with a new employment contract on February 5, 2008, she informed Plaintiff that she was not able to raise her hourly rate at that time because Steppingstone was "on a very tight budget."  (Defs.' Br. Ex. 10, Feb. 5, 2008 Letter).   The May 5, 2008 Contract also did not raise Plaintiff's hourly rate.   Plaintiff claims that other employees received raises as they signed their new contracts.  (Pl.'s Dep. 178:23-180:11).  Defendants argue that the raises Plaintiff refers to occurred in the summer of 2008, after Plaintiff left Steppingstone.   In response, Plaintiff asserts that the mere fact that raises were given at all belies Morse's statement to her. While this certainly is true, Plaintiff ignores Morse's statement in her February 5, 2008 letter that she hopes to raise Plaintiff's hourly rate "next July when our financial strength becomes more clear." (*Id.*)  What is not so clear, however, is whether Morse meant July 2008 or July 2009 when she said "next July."  If Morse meant July 2009 and she gave raises to Sandy Blay and Donna Coffin in July 2008, then Plaintiff would not have not received a raise at the same time that Sandy Blay and Donna Coffin received their raises.  Most likely Morse meant July 2008, but the Court is required to make all inferences in favor of the non-moving party.   Therefore, because of this uncertainty, a genuine issue of material fact remains as to whether Plaintiff suffered a materially adverse action by not receiving a raise around the same time that her co-workers did.

### 2)   Timekeeping Requirements

Plaintiff claims that it was not until after her FLSA complaints that she was grouped with the other "hourly" employees subject to the requirement of work diaries.  Up until January 2008, Plaintiff only had been providing timecards to Sandra Blay.  In January 2008, however, she received an e-mail from Sandra Blay addressed to her and six other Steppingstone employees, informing them

of the protocol for submitting work diaries. (Defs.' Br. Ex. 21, Jan. 14, 2008 E-mail). When Plaintiff inquired as to the reasons for the change and need for detail that had not been required of her in the past, Morse responded that all other hourly employees had been providing this information for years. Even ignoring for a moment that the allegedly new timekeeping requirement came before Plaintiff engaged in statutorily protected activity, such a requirement amounts to nothing more than a minor annoyance. Therefore, the Court does not consider this requirement a materially adverse action against Plaintiff.

### c.     Other Allegations of Retaliation

As to Plaintiff's other allegations of retaliation, the Court agrees with Defendants that these actions fall into the category of minor annoyances or petty slights.

### 3.     Causal Relationship Between Protected Activity and Adverse Action

Defendants also contend that Plaintiff cannot show the fourth and final element of her FLSA retaliation claim—that there is a causal connection between the allegedly adverse action and the protected activity.   To do so, Plaintiff need only "put forth some evidence to deduce a casual connection between the retaliatory action and the protected activity." *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000).   "When an employee is disciplined in close proximity to his or her protected activity, such proximity provides 'highly probative evidence of a casual connection' between the adverse employment action and the protected activity." *Howington v. Quality Restaurant Concepts*, 298 Fed. Appx. 436, 446 (6th Cir. 2008) (unpublished)

Generally, when there is not other compelling evidence, though, temporal proximity alone is insufficient to support a retaliation claim. *Id.* Nonetheless, "there may be circumstances where evidence of temporal proximity alone would be sufficient to support [an] inference" of retaliation.

26

*Id.*

Here, after Plaintiff had operated without a written employment contract for fourteen months, Morse informed Plaintiff some time in January 2008 that she would need to sign a new agreement. Morse presented that contract to Plaintiff on February 5, 2008—only four days after Plaintiff informed the Executive Committee of the FLSA issues.  In fact, Morse readily admits that after Plaintiff went to the Executive Committee with her FLSA concerns, there was an insistence that Plaintiff sign an employee agreement.  (Morse Dep. 207:5-9).   As discussed above, that contract was only for a period of five months, as opposed to one year like her previous employment contract and like those of her co-workers.  (*See* Pl.'s Resp. Br. Exs. G, O).   Morse did not present Plaintiff with another contract until after Plaintiff sent her retaliation complaint to the Executive Committee. Although that contract was for a full year, it included several new provisions that were weighted in Steppingstone's favor and was mostly different from her co-workers' employment contracts.  (*See* Pl.'s Resp. Br. Exs. N, O).  Defendants did attempt to negotiate several other contracts with Plaintiff, but all of these contracts varied from her original contract.

Plaintiff's employment was not terminated until three months after she threatened to go to the Department of Labor with the FLSA issue.  In addition, the seeds that ultimately led to her termination—need for a written employment contract, reduction in responsibilities, mandated hours without prior approval, and payment for use of extended day program—were planted in January 2008, before Plaintiff engaged in a statutorily protected activity.  Nonetheless, the Court cannot ignore that Morse presented Plaintiff with the first revised contract, which ran only through the end of the school year, only four days after Plaintiff informed the Executive Committee of the FLSA issues and the second revised contract, which allowed for Plaintiff to be terminated "for any reason"

27

simply by providing thirty days written notice, only five days after Plaintiff sent her retaliation complaints to the Executive Committee.   The close proximity between Plaintiff reporting her concerns to the Executive Committee and the adverse employment actions against her provides highly probative evidence of a casual connection between the adverse employment action and the protected activity.

In addition, contrary to Defendants' assertion, there is other compelling evidence showing a causal relationship.  Specifically, the evidence does tend to show that Morse was frustrated with Plaintiff pressing the FLSA issue, and reporting her concerns directly to the Executive Committee. In fact, at one point Morse advised the Executive Committee that she wanted Plaintiff to have "no outlet" for her claims.

Accordingly, Plaintiff has established the fourth and final element of her prima facie case of FLSA retaliation.

### 4. Defendants' Burden of Showing Legitimate, Non-Retaliatory Reasons for the Adverse Employment Actions

Now that Plaintiff has met her burden of establishing a prima facie case of retaliation, the burden shifts to Defendants to establish legitimate, non-retaliatory reasons for the adverse employment actions.  As discussed above, the Court considers only Plaintiff's termination, which was precipitated by Defendants formalizing her reduction in responsibilities, her hours being cut, and their regulation of her use of the extended day program, and Defendants' failure to provide Plaintiff with a pay raise around the same time that her co-workers received raises as materially adverse actions against her.

#### a. Plaintiff's Termination

Defendants argue that Plaintiff was terminated because she refused to sign the May 5, 2008

28

Contract.   While this certainly represents a legitimate, non-retaliatory reason for terminating Plaintiff, it does nothing to explain why Plaintiff's contract was altered in the first place.   Plaintiff refused to sign the May 5, 2008 Contract because it contained additional terms that were adverse to her: (1) no human resources responsibilities, (2) pre-approval for hours exceeding twenty per week; and (3) no offset for the extended day program.   That refusal ultimately led to her termination.   Thus, the real issue becomes whether Defendants had legitimate and non-retaliatory reasons for the materially adverse provisions in the May 5, 2008 Contract.

First, as mentioned above, Defendants provide a legitimate, non-retaliatory reason for stripping Plaintiff of her human resources responsibilities: they needed her to focus her efforts on recruitment and retention efforts because of the relocation issue.   Admissions and recruitment were a top priority for Steppingstone at this time, so it made sense for Defendants to strictly limit Plaintiff's duties to admissions and recruitment.   This is reasonable especially given that even after Defendants informed Plaintiff that they were aware of the FLSA issue and dealing with it appropriately, she continued to press the issue with extremely lengthy e-mails.   Plaintiff would not let the issue go, and instead of contacting the Department of Labor with her concerns, she pressed Morse and the Executive Committee further on the issue.

Second, while Defendants limited Plaintiff's hours to twenty per week, both the February 28, 2009 e-mail from Morse and the May 5, 2008 Contract provided that Plaintiff could work over twenty hours per week so long as she gained approval from Morse first.   Seeking such approval may have been slightly more burdensome for Plaintiff, but it cannot be considered materially adverse. Regardless, Defendants did have legitimate reasons for limiting Plaintiff's hours to twenty per week: Steppingstone's budget was tight due to the relocations issues.   If Plaintiff had accrued more hours

29

than needed to offset the cost of her sons' tuition, then Steppingstone would have to pay Plaintiff $35 per hour for each of those hours.  In addition, Plaintiff seemingly was spending much time on pursuing the FLSA issue even after she had been informed that Morse would seek a professional opinion.

Third, although Defendants allowed Plaintiff to use the extended day program free of charge through her last day of work at Steppingstone, the May 5, 2008 Contract clearly provided that Plaintiff could no longer use her wages to offset the fees for extended day program and would now have to pay all expenses related to her sons' attendance in the extended day program.  Defendants contend that the contract provision was necessary because Plaintiff abused their original understanding.  According to Morse, under their original understanding, Plaintiff was supposed to work during the day when her kids were in school,[6] and occasionally, if something arose near the end of the day that required Plaintiff to stay later, she could use the extended day program for free. (Morse Dep. 85:17-22).  But, according to Morse, Plaintiff started working later and later in the day, which meant that her use of the extended day program increased.  (*Id.* 85:23-86:16).  Just in January 2008 alone, Plaintiff used the extended day program on fourteen separate occasions.   (Defs.' Br. Ex. 20, Feb. 28, 2008 Letter).  Sometime in the end of that month, even before Plaintiff engaged in the statutorily protected activity on February 1, 2008, Plaintiff was notified that effective February 1, 2008, she would be charged for the use of the program. (*Id.*).  Plaintiff's excessive use of the program for her children is a legitimate and non-retaliatory reason for requiring Plaintiff to pay for the use of the program.

_____

[6] This is corroborated by Plaintiff's original contract, which provides that her initial hours were from 9-11:30 a.m. (Defs.' Br. Ex. 17).

Lastly, to the extent that the May 5, 2009 Contract looked differently than Plaintiff's co-workers' contracts or to the extent that her employment contract was negotiated by the parties' attorneys, the Court need only look to the content of Plaintiff's correspondence to Morse and the Executive Committee. The first correspondence authored by Plaintiff in the record is a January 14, 2008 e-mail in which Plaintiff questions Steppingstone requiring work diaries for hourly employees, including herself. (Pl.'s Resp. Br. Ex. C). After getting an explanation via e-mail from Morse that same day, Plaintiff again questioned the work diary protocol and interjected that the issue, as well the FLSA issue, are really human resources issues, which, Plaintiff asserted, is where her expertise lies. (*Id.*) Morse then informed Plaintiff that she checked with attorney consultants, who assured her that the FLSA issues were not a concern for Steppingstone and that they could revisit the issue when Morse was through with the relocation issue. (*Id.*)

The next correspondence from Plaintiff in the record is her February 1, 2008 e-mail to the Executive Committee in which she threatens to report the alleged unlawful activity to the U.S. Department of Labor unless Steppingstone creates a "Wage and Hour program" that is in compliance with the law by February 15, 2008. (*Id.*). After Morse again reiterated via e-mail that same day that she had spoke with a legal consultant and Nancy Furman, who both confirmed Morse's understanding of the issue, Plaintiff authored the first of three very lengthy e-mails criticizing Morse's handling of the issue as well as Morse's more general failures as an administrator. (*Id.*). Then, on March 6, 2008, Plaintiff wrote a sixteen page letter to the Executive Committee in which Plaintiff details at great length seventeen alleged acts of retaliation against her and raises the possibility of litigation.

Given the direction in which Plaintiff had taken the issue, Steppingstone was justified in

seeking the advice of outside counsel as to Plaintiff's employment, which ultimately led to her employment contract being structured and negotiated differently than her co-workers' employment contracts.

### b.    No Pay Raise

Defendants  provide a legitimate, non-retaliatory reason for not giving Plaintiff a pay raise: Steppingstone was then operating on a tight budget and Plaintiff's pay would be reevaluated "next July" when Steppingstone's financial strength became clearer.  Just because Plaintiff did not receive a pay raise in May 2008 did not mean that she would not receive a pay raise in July 2008, when the relocation issues apparently were worked out.

Accordingly, Defendants have met their burden of providing legitimate, non-retaliatory reasons for the alleged materially adverse employment actions against Plaintiff.

### 5.    Pretextual Reasons for Retaliation

Because the Court has found that Defendants have met their burden, it is now up to Plaintiff to show that Defendants' proffered legitimate, non-retaliatory reasons are merely pretext for retaliation.   To establish pretext, Plaintiff must produce evidence that the proffered reasons either: (1) have no basis in fact; (2) did not actually motivate the adverse employment actions; or (3) were insufficient to warrant the adverse actions.  *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).  Plaintiff's arguments as to why Defendants' proffered explanations are not credible seem to center on the second and third *Manzer* factors.  Because Plaintiff has not introduced sufficient evidence from which a reasonable fact-finder could find that Defendants' proffered explanation for the adverse actions taken against Plaintiff were not credible under any of the *Manzer* factors, the Court finds that Plaintiff's retaliation claim must fail.

32

First, it is important to emphasize once again that many of the alleged adverse employment actions began before Plaintiff threatened to report the alleged FLSA violations to the U.S. Department of Labor—that is, before Plaintiff engaged in statutorily protected behavior. Defendants first revoked Plaintiff's human responsibilities; first notified Plaintiff that she could no longer use the extended day program for free; and first approached Plaintiff about signing another employment contract with the school all in January 2008. While Morse may have been aware of Plaintiff's FLSA issues at this time, Plaintiff had not yet stepped outside her role as human resources director for Steppingstone; it was not until she threatened to lodge a complaint with U.S. Department of Labor that she did so.

Second, Plaintiff's arguments as to each adverse employment action do not establish pretext. For instance, Plaintiff argues that she was available to work more hours and could have handled her human resources responsibilities in addition to her admissions and recruitment work when Morse revoked her human resources responsibilities. She further contends that by allowing her to utilize her extra hours worked to offset the cost of the extended day program and enhancement classes, Steppingstone would have received the attention to admissions that it desired without a gap in human resources at virtually no cost. What Plaintiff fails to consider, though, is the added expense Steppingstone would have had to incur simply from Plaintiff's use of the extended day program and enhancement classes for her three children. As discussed previously, Steppingstone had budgetary issues at this time and could not incur additional costs.

As to Defendant no longer allowing Plaintiff to use her wages to offset the cost of the extended day program, Plaintiff was not the only Steppingstone employee who was on a barter system and who had her extended day program privileges revoked due to overuse. According to

Morse, she asked Amy Polcyn to cease her use of the extended day program because like Plaintiff, she was exceeding the terms of their original understanding.  What's more, by removing Plaintiff's offset for the extended day program, Defendants were not treating Plaintiff differently.  In fact, they were treating Plaintiff like every other employee.

In regard to Plaintiff not receiving a raise.  The evidence clearly demonstrates that Steppingstone was operating on a tight budget and that Plaintiff's pay would be reevaluated "next July" when Steppingstone's financial strength became clearer.  That Sandy Blay and Donna Coffin received raises in July actually supports Morse's claims that Plaintiff might receive a raise "next July."

Lastly, the evidence actually casts substantial doubt on the credibility of *Plaintiff's behavior* after she engaged in protected behavior.  Plaintiff threatened to report the alleged unlawful activity to the U.S. Department of Labor unless Steppingstone established a "Wage and Hour" program that was in compliance with the law by February 15, 2008.  Yet, despite this explicit threat to the Executive Committee and her repeated concerns that "Steppingstone is not administering in ways that are professional, ethical, practical, or legal," (Defs.' Br. Ex. 9, March 6, 2008 Letter), Plaintiff never reported anything to the U.S. Department of Labor.  If Plaintiff was so confident that her take on the FLSA issues was correct and that Defendants were not just incorrect but also carrying out their administrative functions illegally and unethically, then why did she not report Defendants to the U.S. Department of Labor on February 15, 2008, or anytime thereafter, for that matter?

While Plaintiff did engage in statutorily protected behavior by threatening to report the matter to the U.S. Department of Labor, that does not give her free reign to continue to press the issue and call her superior's administrative abilities into question after she had been informed that

34

her superior sought and received a professional opinion on the issue.  To the extent that Plaintiff suffered materially adverse employment actions after she threatened to report the non-compliance to the U.S.  Department of Labor, the adverse actions do not appear to have stemmed from her threat.  Rather, they seemed to have  stemmed from her insistence on pressing an issue that even she did not believe in enough to properly carry out.  Plaintiff's threat was empty, both in substance and motivation.

Accordingly, the Court finds Defendants' legitimate and non-retaliatory reasons for the adverse employment actions that Plaintiff suffered without pretext.  As such, Plaintiff's claim against Defendants must fail.

III.    **CONCLUSION**

For the reasons stated, the Court **GRANTS** Defendants' Motion for Summary Judgment and **DISMISSES** the action.

**SO ORDERED.**

S/Paul D. Borman_____
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  September 1, 2009

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on

September 1, 2009.

S/Denise Goodine
Case Manager